## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CLAUDE L. PATTERSON, Derivatively on Behalf of CANOO INC., f/k/a HENNESSY CAPITAL ACQUISITION CORP. IV,<br><br>        Plaintiff,<br><br>   v.<br><br>DANIEL J. HENNESSY, NICHOLAS A. PETRUSKA, BRADLEY BELL, PETER SHEA, RICHARD BURNS, JAMES F. O'NEIL III, JUAN CARLOS MAS, GRETCHEN W. MCCLAIN, GREG ETHRIDGE, ULRICH KRANZ, TONY AQUILA, PAUL BALCIUNAS, HENNESSY CAPITAL PARTNERS IV LLC, HENNESSY CAPITAL GROUP LLC, THOMAS DATTILO, FOSTER CHIANG, RAINER SCHMUECKLE, JOSETTE SHEERAN and DEBRA VON STORCH,<br><br>        Defendants,<br><br>   – and –<br><br>CANOO INC., f/k/a HENNESSY CAPITAL ACQUISITION CORP. IV, a Delaware corporation,<br><br>        Nominal Defendant. | Civil Action No.<br><br><br>DEMAND FOR JURY TRIAL |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS, BREACH OF FIDUCIARY DUTY, AND UNJUST ENRICHMENT

1.      This stockholder derivative action is on behalf of nominal defendant Canoo Inc., f/k/a Hennessy Capital Acquisition Corp. IV ("Canoo" or the "Company") against the Company's (and its predecessor's) officers and directors for breaches of fiduciary duty, unjust enrichment, indemnification, contribution, and violations of the federal securities laws. Defendants' actions have caused, and will continue to cause, substantial financial and reputational harm to Canoo.

2.      Hennessy Capital Acquisition Corp. IV ("HCAC IV") is a special purpose acquisition company ("SPAC") – sometimes called a "blank check" company – formed for the sole purpose of acquiring an existing business.  HCAC IV, which had no commercial operations of its own, went public in its March 5, 2019 initial public offering ("IPO"), raising $300,150,000, with its units, Class A common stock and public warrants trading on the NASDAQ stock exchange under the ticker symbols "HCACU," "HCAC," and "HCACW" following the IPO.[1] At the time, HCAC IV stated that "[w]hile the Company may pursue an initial business combination target in any business, industry, sector or geographical location, it intends to focus its search on target businesses in the industrial, infrastructure solutions and value-added distribution sectors in the United States."

3.      Under the terms of its IPO, HCAC IV was required to redeem all its publicly traded shares if it failed to complete a business combination within 18 months of the offering.

4.      With just one month left on its 18-month window to complete a business combination, HCAC IV identified its acquisition target in early August 2020:  Canoo Holdings,

_____

[1]      Simultaneously with the closing of the IPO, HCAC IV completed the private sale of 13,581,500 warrants (the "private placement warrants") for gross proceeds of approximately $13.5 million.  The private placement warrants were sold to defendant Hennessy Capital Partners IV LLC, as well as certain funds and accounts managed by subsidiaries of BlackRock, Inc. at $1.00 per private placement warrant.

Ltd. ("Canoo Holdings"), "a mobility technology company, leading a transformation in the way electric vehicles (EVs) are designed, engineered, and manufactured to capitalize on the true value proposition of an EV."   Using a "breakthrough EV platform," the "skateboard," which is purposefully built to be highly modular and facilitate rapid development of multiple vehicle programs in both the commercial and consumer markets, Canoo Holdings said it "expects to launch its first consumer model in 2022, simply named the canoo and available by subscription, followed shortly after by a multi-purpose delivery vehicle and a sport vehicle, each built off of the same underlying platform."

5.      On August 18, 2020, HCAC IV and Canoo Holdings announced that they had entered into a merger agreement and plan of reorganization through which Canoo Holdings would become a publicly traded company (the "Merger").   Upon the closing of the Merger, HCAC IV would be renamed "Canoo Inc." and its Class A common stock and public warrants would continue to be listed on the NASDAQ and traded under the symbols "GOEV" and "GOEVW," respectively.   After the Merger, each share of Class A common stock was automatically reclassified into one share of Canoo common stock.[2]

6.      In connection with the Merger announcement, HCAC IV and Canoo Holdings highlighted the importance of the Company's engineering and technology services business, which they highlighted as "a unique opportunity to generate immediate revenues" in advance of the post-merger company's first electric vehicle ("EV") offering.   They also represented that Canoo Holdings' engineering and technology services business was expected to generate a compounded average growth rate ("CAGR") of 39%, and that its "current pipeline in this area is

---

[2]      Upon the closing of the Merger, each HCAC IV unit separated into one share of common stock and three-quarters of one warrant and, as a result, the HCAC IV units were not listed on the NASDAQ following the consummation of the Merger.

supportive of a projected $120 million of revenue in 2021." Moreover, HCAC IV and Canoo Holdings stated that financial projection models around the Company's engineering and technology services business were "sustainable," not built on short-term initiatives, and designed with a "very conservative ramp-up."

7.     In connection with the August 18, 2020 Merger announcement, HCAC IV and Canoo Holdings also highlighted Canoo Holdings' agreement with Hyundai Motor Company ("Hyundai") to jointly develop an EV platform for future Hyundai models, which they emphasized as evidence of the significant demand for EVs.

8.     Thereafter, HCAC IV and Canoo Holdings continued to promote the Merger. For example, in a September 24, 2020 presentation to analysts and investors, they represented that Canoo's "realistic approach to volumes and thoughtful go-to-market strategy ensure consistent revenue growth scalability while leaving upside for other opportunities like skateboard licensing," Canoo's "two-pronged subscription and sales model allows for expected long-term cash flow generation, and as [the Company] scale[s] up the volume of B2C and B2B vehicles, [Canoo] expect[s] strong margin expansion." HCAC VI and Canoo Holdings further represented that the Company's engineering and technology services business enjoyed strong partnerships with major automotive original equipment manufacturer ("OEMs"), including Hyundai which they represented had chosen Canoo as its EV partner to jointly develop an all-electric platform based on Canoo's skateboard design for Hyundai and Kia EVs and purpose-built vehicles.

9.     As 2020 continued to unfold, the buzz around the proposed Merger intensified. For example, on December 6, 2020, an article entitled "Canoo Bulls Should Buckle up as the Company's Merger With the SPAC Hennessy Capital Acquisition Corp. IV (NASDAQ: HCAC) Will Likely Be Formalized on the 21st of December," reported that:

Canoo plans to engage an OEM to produce its vehicles, thereby reducing its CAPEX requirements. As far as financial projections are concerned, the company expects to earn a revenue of $120 million in 2021. This top-line metric, however, is expected to swell to $1.43 billion by 2024 and to a whopping $4.12 billion by 2026.

10.     On December 7, 2020, HCAC IV announced that it would hold a Special Meeting of its stockholders to vote on the proposed Merger on December 21, 2020. As the meeting date approached, the Company continued to promote the proposed Merger through positive press releases about Canoo Holdings' EVs.

11.     For example, on December 17, 2020, Canoo Holdings announced its new fully electric multi-purpose vehicle, with limited availability beginning in 2022, and with scaled production and launch planned for 2023. The press release stated:

> Canoo, a company developing breakthrough electric vehicles (EVs), revealed today its all-electric multi-purpose delivery vehicle to be priced starting at approximately $33,000. The vehicle is purposefully designed to maximize return on investment for its customers. It is based on Canoo's proprietary electric platform and will be offered in two initial size variants, with others to follow. Limited availability will begin in 2022, with scaled production and launch planned for 2023. With its multi-purpose delivery vehicle, Canoo plans to offer customers best-in-class total cost of ownership, class-leading cargo volume, and functionally-designed features. Customers can pre-order the multi-purpose delivery vehicle for a refundable deposit of $100 per vehicle at www.canoo.com/mpdv.

Footnotes omitted.

12.     One week later, HCAC IV stockholders approved the Merger at the Special Meeting. On December 21, 2020, HCAC IV and Canoo Holdings issued a press release announcing the successful stockholder vote and the closing of the business combination.

13.     Post-Merger, Canoo continued to aggressively promote its business to bolster its ongoing efforts to raise additional capital. For example, on January 12, 2021, an article entitled "Exclusive: Apple held talks with EV startup Canoo in 2020" appeared in *The Verge*, leaking that "Apple held meetings with California EV startup Canoo in the first half of 2020 as part of

the Silicon Valley giant's secretive effort to advance its own electric vehicle project."  People familiar with the talks also told *The Verge* that "[t]he two companies discussed options ranging from investment to an acquisition."

14.     Similarly, in early January 2021, the Company announced its Board of Directors' (the "Board") "'wealth of knowledge and experience with public companies . . . will help Canoo capitalize on the major opportunities we see in the electric vehicle market today.'"

15.     On January 13, 2021, Canoo filed a shelf Registration Statement on Form S-1 (the "Shelf Registration Statement") with the U.S. Securities and Exchange Commission ("SEC"), in which the Company announced its intent to sell additional shares of Canoo common stock and warrants, raising up approximately $280.1 million from the exercise of the warrants, assuming the exercise in full of all of the warrants for cash.  The "Selling Shareholders" – including most of the Individual Defendants (Daniel J. Hennessy, Nicholas A. Petruska, Bradley Bell, Peter Shea,     Richard     Burns,     James     F.     O'Neil     III, Juan Carlos Mas, Gretchen W. McClain, Greg Ethridge, Ulrich Kranz, Tony Aquila and Paul Balciunas) – registered for sale more than $97.3 million worth of their individual holdings of Canoo Holdings.[3]

16.     A majority of the current members of Canoo's Board signed the Shelf Registration and caused it to be filed with the SEC and disseminated to Canoo stockholders.  This includes defendants Tony Aquila, Foster Chiang, Thomas Dattilo, Greg Ethridge, Rainer Schmueckle,

---

[3]     Specifically, the Shelf Registration Statement registered for sale: (i) 186.6 million shares of Canoo common stock by certain selling security holders, including the Individual Defendants and/or certain of their affiliates; (ii) 22.5 million shares of Canoo common stock issuable upon the   exercise   of   the   public   warrants   by   the   holders   thereof;   and (iii) 1.8 million shares of Canoo common stock issuable upon the exercise of the private placement warrants by the holders thereof.

Josette Sheeran and Debra von Storch.  Defendant Paul Balciunas, Canoo's Chief Financial Officer ("CFO"), also signed the Shelf Registration Statement.

17.     The Shelf Registration Statement carried forward many of the material misrepresentations and omissions first made in connection with the Merger and thereafter.  For example, the Shelf Registration Statement stated with respect to Canoo's engineering and technology services business, the sole line business that had been developed to the point of generating any revenue, that it provided Canoo with "a unique opportunity to generate immediate revenues" in advance of its first EV offering.

18.     The Shelf Registration Statement also stated with respect to Canoo's engineering and technology services business – the sole line business that had been developed to the point of generating any revenue – provided the Company with "a unique opportunity to generate immediate revenues in advance of the offering of our first vehicle and our current pipeline in this area is supportive of a projected $120 million of revenue in 2021."

19.     The Shelf Registration Statement further stated with respect to potential revenue growth opportunities that Canoo's engineering and technology services business is expected to "offer significant growth potential in the future as projected demand grows for EVs and their related technologies, namely in platform/skateboard development, powertrain, battery technologies and power electronics, among other areas, in which we have substantial expertise."

20.     The Shelf Registration Statement further stated with respect to the Company's engineering and technology services business that, "[i]n addition to providing external commercial validation of our technical capabilities, these contract engagements establish an attractive strategic pipeline for future business opportunities and de-risk our overall business

model."  In truth, and as defendants knew, or recklessly ignored, Canoo abandoned its engineering services business prior to the Merger.

21.    The Shelf Registration Statement further stated with respect to the Company's relationship with Hyundai that, "[i]n February 2020, we entered into an agreement with Hyundai Motor Group to co-develop a future EV platform based on our modular and scalable skateboard technology, providing further validation of our technical leadership and external confidence in our commercial prospects."  In fact, and as defendants knew, or recklessly ignored, Canoo suspended its arrangement with Hyundai prior to the Merger.

22.    On January 25, 2021, Canoo filed a Prospectus with the SEC, which formed part of the Shelf Registration Statement.  Later that same day, the SEC declared the Shelf Registration Statement effective.

23.    As early 2021 unfolded, Canoo continued to aggressively promote its business. On March 10, 2021, the Company announced plans to produce an all-electric pickup truck.  The press release stated that Canoo "debuted today its fully-electric pickup truck during the Motor Press Guild's Virtual Media Day (VMD) in partnership with Automobility LA."  "The pickup truck is the third vehicle that will be based on the company's proprietary multi-purpose platform architecture," the press release stated, "enabling the accelerated development timeline."  "The production version of the pickup truck will open for preorders in Q2 2021, with deliveries beginning as early as 2023," the press release concluded.

24.    Defendants'  unlawful  scheme  continued  until  late  March  2021. On March 29, 2021, Canoo announced its 2020 fourth quarter and full year financial results. Evidencing the Company's abandonment of its engineering and technology services line of business and the curtailment of its arrangement with Hyundai by no later than the beginning of

the 2020 fourth quarter, Canoo reported no engineering services revenue during the fourth quarter of 2020, after having reported $2.55 million in engineering services revenue during the first nine months of 2020.  The Company also announced that defendant Paul Balciunas, who served as Canoo's CFO following the close of the Merger, resigned effective April 2, 2021.

25.     On the same date, Canoo held an earnings conference call with analysts and investors to discuss the Company's operations and earnings release.  During the call, defendant Tony Aquila for the first time revealed that Canoo decided to "de-emphasize the originally stated contract engineering services line" and that its highly touted arrangement with Hyundai had been placed "on hold."

26.     On this news, the trading price of Canoo common stock crashed more than 21% in a single day, down from $11.80 per share on March 29, 2021 to $9.30 per share on March 30, 2012, eventually falling to $8.47 per share on April 5, 2021, wiping out more than $1.6 billion in once valuable stockholders' equity.

27.     Defendants are responsible for making and/or allowing false and misleading statements to be made, thereby misleading Canoo stockholders and investors, violating state and federal securities laws, and breaching their fiduciary duties.  As a direct result, the Company has suffered significant damage.

28.     For example, the Company now faces class action lawsuits brought by Canoo stockholders (the "Securities Class Actions") alleging that the Company and defendants Daniel J. Hennessy, Nicholas A. Petruska, Bradley Bell, Peter Shea, Richard Burns, James F. O'Neil, Juan Carlos Mas, Gretchen W. McClain, Greg Ethridge, Ulrich Kranz, Tony Aquila, Paul Balciunas, Hennessy Capital Partners IV LLC, and Hennessey Capital LLC violated §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").  The

Securities Class Actions seek to recover damages on behalf of stockholders who purchased or acquired the common stock of Canoo (or its predecessor company, HCAC IV), between August 18, 2020 and March 29, 2021.

29.     Due to the Canoo Board's involvement in the wrongdoing, the substantial likelihood of liability its members face, and its members' lack of independence, any demand upon the Board to rectify this wrongdoing would be a wasteful and useless act.  Accordingly, plaintiff now brings this action to remedy the harm to Canoo caused by defendants' faithless actions.

## JURISDICTION AND VENUE

30.     This Court has jurisdiction under 28 U.S.C. §1331 because certain of the claims asserted herein arise under §§10(b), 14(a), 20(a) and 21D of the Exchange Act.  This Court also has supplemental jurisdiction over the state law claims under 28 U.S.C. §1367.

31.     In connection with the acts, conduct and other wrongs complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

32.     The Court has personal jurisdiction over each defendant because each defendant is either a corporation that does sufficient business in this District or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the district courts permissible under traditional notions of fair play and substantial justice.

33.     Venue is proper in this Court in accordance with 28 U.S.C. §1391(b) because Canoo is a Delaware corporation and a substantial portion of the transactions and wrongs complained of herein, including defendants' participation in the wrongful acts detailed herein, occurred in this District.

**THE PARTIES**

34.    Plaintiff Claude L. Patterson is, and continuously has been, a stockholder of Canoo (and its predecessor company) since December 2020.

35.    Nominal defendant Canoo, a Delaware corporation, is a mobile technology company that develops breakthrough electric vehicles that are reinventing the automobile landscape.  The Company's Class A common stock and public warrants trade on the NASDAQ stock exchange under the symbols "GOEV" and "GOEVW," respectively.  Canoo's predecessor company, HCAC IV's units, Class A common stock and public warrants traded on the NASDAQ under the symbols "HCACU," "HCAC," and "HCACW," respectively.

36.    Defendant Daniel J. Hennessy ("Hennessy") served as Chairman of the Board of Directors and Chief Executive Officer ("CEO") of HCAC IV until the Merger.  Defendant Hennessy was, at all relevant times, a member of Hennessy Capital Partners IV LLC ("HCP IV Sponsor"), the Company's Sponsor, and the manager of Hennessy Capital Group LLC ("HC LLC"), the managing member of HCP IV Sponsor.  Defendant Hennessy is named as a defendant in the Securities Class Actions alleginghe violated §§10(b) and 20(a) of the Exchange Act.  Defendant Hennessy knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Canoo's SEC filings, press releases and other public statements.  Defendant Hennessy also negligently violated §14(a) of the Exchange Act by making improper statements in connection with the proxy solicitation of stockholder votes in favor of the Merger and in the Company's public communications.  Post-Merger, defendant Hennessy sold 1,355,853 shares of Canoo common stock for $19,470,049 in unlawful proceeds, through the Company's January 12, 2021 Shelf Registration Statement.

37.    Defendant Nicholas A. Petruska ("Petruska") served as Executive Vice President and CFO of HCAC IV until the Merger.  Defendant Petruska was, at all relevant times, a member

of HCP IV Sponsor and has served as Vice President of HC LLC since November 2013. Defendant Petruska is named as a defendant in the Securities Class Actions alleging he violated §§10(b) and 20(a) of the Exchange Act. Defendant Petruska knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Canoo's SEC filings, press releases and other public statements. Defendant Petruska also negligently violated §14(a) of the Exchange Act by making improper statements in connection with the proxy solicitation of stockholder votes in favor of the Merger and in the Company's public communications. Post-Merger, defendant Petruska sold 363,188 shares of Canoo common stock for $5,215,379 in unlawful proceeds, through the Company's January 12, 2021 Shelf Registration Statement.

38.     Defendant Bradley Bell ("Bell") served as a member of HCAC IV's Board of Directors at the time of the Merger. Defendant Bell was, at all relevant times, a member of HCP IV Sponsor. Defendant Bell is named as a defendant in the Securities Class Actions alleging he violated §§10(b) and 20(a) of the Exchange Act. Defendant Bell knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Canoo's SEC filings, press releases and other public statements. Defendant Bell also negligently violated §14(a) of the Exchange Act by making improper statements in connection with the proxy solicitation of stockholder votes in favor of the Merger and in Canoo's public communications. Post-Merger, defendant Bell sold 273,600 shares of Canoo common stock for $3,928,896 in unlawful proceeds, through the Company's January 12, 2021 Shelf Registration Statement.

39.     Defendant Peter Shea ("Shea") served as a member of HCAC IV's Board of Directors at the time of the Merger. Defendant Shea was, at all relevant times, a member of HCP IV Sponsor. Defendant Shea is named as a defendant in the Securities Class Actions alleging he violated §§10(b) and 20(a) of the Exchange Act. Defendant Shea knowingly, recklessly, or with

gross negligence made (or allowed to be made) improper statements in Canoo's SEC filings, press releases and other public statements.  Defendant Shea also negligently violated §14(a) of the Exchange Act by making improper statements in connection with the proxy solicitation of stockholder votes in favor of the Merger and in the Company's public communications.  Post-Merger, defendant Shea sold 273,600 shares of Canoo common stock for $3,928,896 in unlawful proceeds, through the Company's January 12, 2021 Shelf Registration Statement.

40.     Defendant Richard Burns ("Burns") served as a member of HCAC IV's Board of Directors at the time of the Merger.  Defendant Burns was, at all relevant times, a member of HCP IV Sponsor.  Defendant Burns is named as a defendant in the Securities Class Actions alleging he violated §§10(b) and 20(a) of the Exchange Act.  Defendant Burns knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Canoo's SEC filings, press releases and other public statements.   Defendant Burns also negligently violated §14(a) of the Exchange Act by making improper statements in connection with the proxy solicitation of stockholder votes in favor of the Merger and in Canoo's public communications.  Post-Merger, defendant Burns sold 273,600 shares of the Company's common stock for $3,928,896 in unlawful proceeds, through Canoo's January 12, 2021 Shelf Registration Statement.

41.     Defendant James F. O'Neil III ("O'Neil") served as a member of HCAC IV's Board of Directors at the time of the Merger.  Defendant O'Neil was, at all relevant times, a member of HCP IV Sponsor.  Defendant O'Neil is named as a defendant in the Securities Class Actions alleging he violated §§10(b) and 20(a) of the Exchange Act.  Defendant O'Neil knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Canoo's SEC filings, press releases and other public statements.  Defendant O'Neil

also negligently violated §14(a) of the Exchange Act by making improper statements in connection with the proxy solicitation of stockholder votes in favor of the Merger and in Canoo's public communications. Post-Merger, defendant O'Neil sold 283,600 shares of Canoo common stock for $4,072,496 in unlawful proceeds, through the Company's January 12, 2021 Shelf Registration Statement.

42.     Defendant Juan Carlos Mas ("Mas") served as a member of HCAC IV's Board of Directors at the time of the Merger. Defendant Mas was, at all relevant times, a member of HCP IV Sponsor. Defendant Mas is named as a defendant in the Securities Class Actions alleging he violated §§10(b) and 20(a) of the Exchange Act. Defendant Mas knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Canoo's SEC filings, press releases and other public statements. Defendant Mas also negligently violated §14(a) of the Exchange Act by making improper statements in connection with the proxy solicitation of stockholder votes in favor of the Merger and in Canoo's public communications. Post-Merger, defendant Mas sold 248,600 shares of Canoo common stock for $3,569,896 in unlawful proceeds, through the Company's January 12, 2021 Shelf Registration Statement.

43.     Defendant Gretchen W. McClain ("McClain") served as a member of HCAC IV's Board of Directors at the time of the Merger. Defendant McClain was, at all relevant times, a member of HCP IV Sponsor. Defendant McClain is named as a defendant in the Securities Class Actions alleging she violated §§10(b) and 20(a) of the Exchange Act. Defendant McClain knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Canoo's SEC filings, press releases and other public statements. Defendant McClain also negligently violated §14(a) of the Exchange Act by making improper statements in connection with the proxy solicitation of stockholder votes in favor of the Merger and in

Canoo's public communications.  Post-Merger, defendant McClain sold 179,160 shares of Canoo

common stock for $2,572,737 in unlawful proceeds, through the Company's January 12, 2021

Shelf Registration Statement.

44.      Defendant Greg Ethridge ("Ethridge") served as a member of HCAC IV's Board

of Directors at the time of the Merger and, at all relevant times, was a member of HCP IV

Sponsor.  Defendant Ethridge has served as a member of Canoo's Board since the Merger.

Defendant Ethridge is named as a defendant in the Securities Class Actions alleging he violated

§§10(b) and 20(a) of the Exchange Act.  Defendant Ethridge signed the Company's false and

misleading January 13, 2021 Shelf Registration Statement.  Defendant Ethridge knowingly,

recklessly, or with gross negligence made (or allowed to be made) improper statements in

Canoo's SEC filings, press releases and other public statements.  Defendant Ethridge also

negligently violated §14(a) of the Exchange Act by making improper statements in connection

with the proxy solicitation of stockholder votes in favor of the Merger and in Canoo's public

communications.  In 2020, the Company paid defendant Ethridge $502,310 upon completion of

the Merger.

45.      Defendant Ulrich Kranz ("Kranz") served as Co-Founder and CEO of Canoo

Holdings until the Merger when he became the Company's CEO, in Charge.  Defendant Kranz

is named as a defendant in the Securities Class Actions alleging he violated §§10(b) and 20(a) of

the Exchange Act.  Defendant Kranz knowingly, recklessly, or with gross negligence made (or

allowed to be made) improper statements in Canoo's SEC filings, press releases and other public

statements.  Defendant Kranz also negligently violated §14(a) of the Exchange Act by making

improper statements in connection with the proxy solicitation of stockholder votes in favor of the

Merger and in Canoo's public communications.  In 2020, Canoo paid defendant Kranz $708,045.

Post-Merger, defendant Kranz sold 1,365,813 shares of the Company's common stock for $19,613,074 in unlawful proceeds, through Canoo's January 12, 2021 Shelf Registration Statement.  As of April 23, 2021, defendant Kranz beneficially owned 1,257,987 shares of the Company's common stock which was worth $10,957,066.

46.   Defendant Tony Aquila ("Aquila") served as Executive Chairman of Canoo effective with the Merger.  Defendant Aquila has served as a member of the Company's Board since the Merger.  Defendant Aquila is named as a defendant in the Securities Class Actions alleging he violated §§10(b) and 20(a) of the Exchange Act.  Defendant Aquila signed the Company's false and misleading January 13, 2021 Shelf Registration Statement.  Defendant Aquila knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Canoo's SEC filings, press releases and other public statements.  Defendant Aquila also negligently violated §14(a) of the Exchange Act by making improper statements in connection with the proxy solicitation of stockholder votes in favor of the Merger and in Canoo's public communications.  In 2020, the Company paid defendant Aquila $35,617,564.  Post-Merger, defendant Aquila sold 15,333,504 shares of Canoo common stock for $220,189,117 in unlawful proceeds, through the Company's January 12, 2021 Shelf Registration Statement.

47.   Defendant Paul Balciunas ("Balciunas") served as Chief of Finance and Corporate Development of Canoo Holdings until the Merger when he became Canoo's CFO until his resignation from the Company effective April 2, 2021.  Defendant Balciunas is named as a defendant in the Securities Class Actions alleging he violated §§10(b) and 20(a) of the Exchange Act.  Defendant Balciunas knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Canoo's SEC filings, press releases and other public statements. Defendant Balciunas also negligently violated §14(a) of the Exchange Act by making improper

- 15 -

statements in connection with the proxy solicitation of stockholder votes in favor of the Merger and in the Company's public communications. In 2020, Canoo paid defendant Balciunas $2,552,853. Post-Merger, defendant Balciunas sold 272,164 shares of the Company's common stock for $3,908,275 in unlawful proceeds, through Canoo's January 12, 2021 Shelf Registration Statement.

48.     Defendant HCP IV Sponsor is a Delaware limited liability company and an affiliate of defendant Hennessy. At all relevant times, HCP IV Sponsor was the Sponsor of HCAC IV. Defendant HCP IV Sponsor knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Canoo's SEC filings, press releases and other public statements. Defendant HCP IV Sponsor also negligently violated §14(a) of the Exchange Act by making improper statements in connection with the proxy solicitation of stockholder votes in favor of the Merger and in the Company's public communications.

49.     Defendant HC LLC is an affiliate and the managing member of HCP IV Sponsor. Defendant Hennessy is the Founder, Managing Member, Chairman and CEO of defendant HC LLC. Defendant HC LLC knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Canoo's SEC filings, press releases and other public statements. Defendant HC LLC also negligently violated §14(a) of the Exchange Act by making improper statements in connection with the proxy solicitation of stockholder votes in favor of the Merger and in the Company's public communications.

50.     Defendant Thomas Dattilo ("Dattilo") has served as a member of Canoo's Board since the Merger. Defendant Dattilo signed the Company's false and misleading January 13, 2021 Shelf Registration Statement. Defendant Dattilo knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in the Company's SEC filings,

press releases and other public statements.  In March 2021, defendant Dattilo received 18,556 restricted stock units ("RSUs") with an aggregate value of $275,000.

51.    Defendant Foster Chiang ("Chiang") has served as a member of Canoo's Board since the Merger.  Defendant Chiang signed the Company's false and misleading January 13, 2021 Shelf Registration Statement.  Defendant Chiang knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in the Company's SEC filings, press releases and other public statements.  In March 2021, defendant Chiang received 18,556 RSUs with an aggregate value of $275,000.

52.    Defendant Rainer Schmueckle ("Schmueckle") has served as a member of Canoo's Board since the Merger.  Defendant Schmueckle signed the Company's false and misleading January 13, 2021 Shelf Registration Statement.  Defendant Schmueckle knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in the Company's SEC filings, press releases and other public statements.  In March 2021, defendant Schmueckle received 18,556 RSUs with an aggregate value of $275,000.

53.    Defendant Josette Sheeran ("Sheeran") has served as a member of Canoo's Board since the Merger.  Defendant Sheeran signed the Company's false and misleading January 13, 2021 Shelf Registration Statement.  Defendant Sheeran knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Canoo's SEC filings, press releases and other public statements.  In March 2021, defendant Sheeran received 18,556 RSUs with an aggregate value of $275,000.

54.    Defendant Debra von Storch ("von Storch") has served as a member of Canoo's Board since January 12, 2021.  Defendant von Storch signed the Company's false and misleading January 13, 2021 Shelf Registration Statement.  Defendant von Storch knowingly, recklessly, or

with gross negligence made (or allowed to be made) improper statements in Canoo's SEC filings, press releases, and other public statements. In March 2021, defendant von Storch received 18,556 RSUs with an aggregate value of $275,000.

55.     Defendants Hennessy, Petruska, Bell, Shea, Burns, O'Neil, Mas, McClain, Ethridge, Dattilo, Chiang, Schmueckle, Sheeran and von Storch are collectively referred to herein as the "HCAC IV Individual Defendants." Defendants Kranz, Aquila and Balciunas are collectively referred to herein as the "Canoo Individual Defendants." Defendants HCP IV Sponsor and HC LLC are collectively referred to herein as the "Blank Check Sponsor Defendants." The HCAC IV Individual Defendants and the Canoo Individual Defendants are collectively referred to herein as the "Individual Defendants." Unless otherwise noted, the Company and the Individual Defendants are collectively referred to as "Defendants."

## FACTUAL ALLEGATIONS

56.     Based in greater Los Angeles, California, Canoo is a mobile technology company that develops electric vehicles. "Distinguished by its experienced team – totaling over 350 employees from leading tech and automotive companies – the Company has designed a modular skateboard platform purpose-built to deliver maximum vehicle interior space and adaptable to support a wide range of vehicle applications for consumers."

## HCAC IV GOES PUBLIC AND ACQUIRES CANOO

57.     HCAC IV is a blank check company or SPAC formed under the laws of the state of Delaware on or about August 6, 2018 for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, or similar business combinations with one or more businesses. HCAC IV was led by defendant Hennessy, its CEO and Chairman. HCAC IV's sponsor, Hennessy Capital Partners IV LLC (HCP IV Sponsor), is a Delaware limited liability

company controlled by defendant Hennessy through Hennessy Capital Group LLC (HC LLC), an affiliate and managing member of Hennessy Capital IV LLC (HCP IV Sponsor).

58.     On February 11, 2019, HCAC IV filed for its $300 million IPO.

59.     HCAC IV's Registration Statement filed that day stated, in relevant part, as follows:

> We have not selected any specific business combination target and we have not, nor has anyone on our behalf, initiated any substantive discussions, directly or indirectly, with any business combination target.  While we may pursue an acquisition opportunity in any business, industry, sector or geographical location, we intend to identify and acquire a business focusing on industrial, infrastructure solutions and value-added distribution sectors in the United States (which may include a business based in the United States which has operations or opportunities outside of the United States).  We will seek to acquire one or more businesses with an aggregate enterprise value of $750 million or greater.

60.     HCAC IV further stated that it was targeting "one or more businesses with an aggregate enterprise value of $750 million or greater."

61.     HCAC IV's Registration Statement further stated with respect to its expertise as a SPAC sponsor that "a partnership through one of its SPAC vehicles is a 'Catalyst for Growth,'" and that HCAC IV "intends to focus on opportunities that will deliver outsized growth to its investors."

62.     HCAC IV further stated with respect to identifying a suitable acquisition target, that it recruited and organized a group of eight highly accomplished and engaged directors to aid HCAC IV in investment origination, key risk assessment, opportunities and due diligence. HCAC IV emphasized that defendant Hennessy is "one of the longest tenured and most experienced SPAC sponsor executives," with over 25 years of experience in the private equity investment business.  HCAC IV further still represented that its group of eight directors had extensive experience with acquisitions, divestitures and corporate strategy, and possess relevant domain expertise in the sectors then being targeted by HCAC IV for a business combination.

63.    HCAC IV further stated that it expected to conduct a thorough due diligence review process encompassing, among other things, "a review of the target's quality of earnings, IPO readiness, commercial and competitive analysis, operations and performance improvement, strategic growth opportunities as well as customary legal and accounting due diligence."

64.    HCAC IV further stated with respect to determining the fair market value of its initial business combination that HCAC IV's "board of directors will make the determination as to the fair market value of our initial business combination."

65.    HCAC IV further stated with respect to the criteria and guidelines it would use to evaluate prospective target businesses as follows:

> We will use these criteria and guidelines in evaluating acquisition opportunities, but we may decide to enter into our initial business combination with a target business that does not meet these criteria and guidelines.
>
> *        *        *
>
> •    **Established Companies with Proven Track Records**.  We will seek to acquire one or more established companies with consistent historical financial performance.  We will typically focus on companies with a history of strong operating and financial results and strong fundamentals. We do not intend to acquire start-up companies or companies with recurring negative free cash flow.
>
> •    **Companies with Proven Revenue and Earnings Growth or Potential for Revenue and Earnings Growth**.  We will seek to acquire one or more businesses that have achieved or have the potential for significant revenue and earnings growth through a combination of organic growth, synergistic add-on acquisitions, new products, markets and geographies, increased production capacity, expense reduction and increased operating leverage.
>
> •    **Companies with, or with the Potential for, Strong Free Cash Flow Generation**.  We will seek to acquire one or more businesses that already have, or have the potential to generate, consistent, stable and increasing free cash flow.  We will focus on one or more businesses that have predictable revenue streams.
>
> •    **Strong Competitive Position**.  We intend to focus on acquisition targets that have a leading, growing or niche market position in their respective industries.   We will analyze the strengths and weaknesses of target

businesses relative to their competitors. We will seek to acquire one or more businesses that demonstrate advantages when compared to their competitors, which may help to protect their market position and profitability.

- **Experienced Management Team**. We will seek to acquire one or more businesses with a complete, experienced management team that provides a platform for us to further develop the acquired business's management capabilities. We will seek to partner with a potential target's management team and expect that the operating and financial abilities of our executive team and board will complement their own capabilities.

- **Sectors Exhibiting Secular Growth or with Potential for Cyclical Uptick**. We intend to focus on acquisition targets in sectors which exhibit positive secular growth or potential for near-term cyclical uptick. We plan to identify sectors that have demonstrated strong positive growth in recent years, possess drivers for continued growth and are strategically positioned to benefit from upswings in their respective industry cycles.

66.     HCAC IV further stated that "[i]f we are unable to complete our initial business combination within 18 months from the closing of this offering, we will redeem 100% of the public shares for cash."

67.     On February 28, 2019, the SEC declared effective HCAC IV's Registration Statement for its IPO.

68.     On March 5, 2019, HCAC IV announced that it had closed its IPO of 30,015,000 units at an offering price of $10.00 per unit, resulting in gross proceeds of $300,150,000. Simultaneously with the closing of the IPO, HCAC IV sold 13,581,500 warrants at a price of $1.00 per private placement warrant in a private placement, generating an additional $13,581,500 in proceeds.

69.     HCAC IV's units, Class A common stock and public warrants were listed on the NASDAQ and commenced trading under the ticker symbols "HCACU," "HCAC," and "HCACW," respectively. Each HCAC IV unit consisted of one share of HCAC IV's Class A

common stock and three-quarters of one redeemable warrant, entitling the warrant holder to purchase one share of Class A common share at $11.50 per share.

**Canoo Holdings**

70.     Co-founded in January 2018 as a private company by defendant Kranz, Canoo Holdings is an electric automotive startup.  It has developed a breakthrough EV platform, or skateboard, purpose-built to be highly modular and to facilitate rapid development of multiple vehicle programs in both the commercial and consumer markets.  Canoo Holdings plans to build up to four electric vehicles which are expected to ultimately cost between around $35,000-$50,000.

71.     Canoo Holdings debuted its first subscription-only electric model, called "canoo," on September 24, 2019, to much fanfare.  The company's press release glowingly stated:

> Canoo, the Los Angeles based company creating electric vehicles (EV) for subscription only, has unveiled today its first model, simply called canoo.  The design challenges traditional automotive shape and functionality and capitalizes on EV architecture in a way that provides significantly more interior space.  Canoo created this spacious vehicle for a world in which transportation is becoming increasingly electric, shared and autonomous.
>
> In less than 19 months since Canoo started, the company has achieved a major milestone by designing and engineering its first model, which is ready to present to the public.
>
> "We believe that the potential of EV architecture can enable a post-SUV era that addresses the ever-growing desire for space and value," said Ulrich Kranz, In Charge at Canoo.  "We promised a truly different approach for EVs, and our canoo proves that we can deliver on that vision.  The unveiling also kicks off the period of beta testing, meaning we are on track for our launch date in 2021.  We are very proud of the team.  In my 30 years' experience, I have never seen so many quality achievements in such a short time."

72.     On the same day, *The Verge* reported that "Canoo's first vehicle . . . , is a sort of boxy, modern take on the Volkswagen Microbus . . . with lots more windows that follow right to the back of the vehicle, including a few that pop out, just like on those old Microbuses."  *The*

*Verge* further reported that "Canoo reportedly has a commitment of around $1 billion from a group of unnamed investors." *The Verge* further reported that Canoo "plans to start road testing the vehicle later this year, ahead of the planned 2021 launch."

73.     On September 24, 2019, in an article entitled "Canoo takes the covers off of its debut electric vehicle," *TechCrunch* reported that "[t]he Los Angeles-based startup Canoo has finally unveiled its first model, the eponymously named canoo," which it plans to launch in 2021 in Los Angeles, California and in eight additional other cities on the East and West Coasts.   The article continued:

> Remarkably, Canoo has completed the design and engineering of its first model in just 19 months and is preparing its vehicles for production through a contract manufacturer.  The first cars are slated to appear on the road by 2021, according to the company's current leader, Ulrich Kranz.
>
> *                *                *
>
> Canoo will launch its first vehicles in the Los Angeles market and expects to not only provide its "skateboard" platform for its own vehicles, but potentially work with other customers that would put their own cabin on top of the Canoo platform, Kranz says.
>
> The company intends to go to market with an entirely new business model by providing customers with its cars for a monthly subscription fee.  That service will likely include perks like automatic vehicle registration, maintenance, insurance management and charging through a single app on a customer's phone. The idea, the company says, is to bring the convenience and affordability of a Netflix movie service to the auto industry.
>
> *                *                *
>
> The rental model will help, as will the company's conservative rollout plan.  Kranz says that Canoo will start offering its subscription vehicles in one geography and scale slowly from there.
>
> "We will roll out city-by-city," he says.  "Eight to 10 cities represent more than 70% of all the electric vehicle population [so] there is no need to provide our EV nationwide."

> The plan for 2021 is to launch in Los Angeles and have another eight cities account for the company's U.S. market. That means four on the West Coast and four on the East Coast, according to Kranz.
>
> "After the launch in the U.S. we are considering launching the vehicle in China . . . . There are 18 cities that represent 75% of the EV population in China," he said.

**HCAC IV Acquires Canoo Holdings**

74.    On August 18, 2020, HCAC IV announced that it had entered into a definitive agreement for a business combination with Canoo Holdings, which would result in Canoo Holdings becoming a publicly traded company. The transaction was described as follows:

> **Transaction Overview**
>
> The business combination values Canoo at an implied $2.4 billion pro forma equity value, at the $10.00 per share price and assuming no redemptions of HCAC's existing public stockholders. The combined company will receive approximately $600 million of proceeds from an upsized fully committed common stock PIPE offering of over $300 million, along with the approximately $300 million cash held in trust assuming no redemptions of HCAC's existing public stockholders. The boards of directors of both Canoo and HCAC have unanimously approved the proposed business combination, which is expected to be completed in the fourth quarter of 2020, subject to, among other things, the approval by HCAC stockholders and the satisfaction or waiver of other customary closing conditions.

75.    On the same day, an article in *Business Insider* entitled "Electric-vehicle maker Canoo will merge with 'blank-check' company to raise $600 million in a public offering (HCAC)" reported:

> The hot SPAC trend of 2020 continued on Tuesday after Canoo, an electric vehicle maker based in Los Angeles, announced it would go public via a reverse merger with Hennessy Capital Acquisition Corp. in a deal valued at $2.4 billion.
>
> *           *           *
>
> Canoo plans to launch its first model, dubbed "Canoo," in 2022, followed by a business-to-business commercial delivery vehicle in 2023.

76.    On August 18, 2020, *Tech Crunch* also reported in an article entitled "Electric vehicle startup Canoo to go public via SPAC" that:

Canoo said it was able to raise $300 million in private investment in public equity, or PIPE, including investments from funds and accounts managed by BlackRock.  Through the transaction, Canoo said it will have about $600 million that will go toward the production and launch of electric vehicles built off of its underlying skateboard technology.

77.     As 2020 continued to unfold, the buzz around the Merger increased. For example, on December 6, 2020, an article entitled "Canoo Bulls Should Buckle up as the Company's Merger With the SPAC Hennessy Capital Acquisition Corp. IV (NASDAQ: HCAC) Will Likely Be Formalized on the 21st of December," reported that:

Canoo plans to engage an OEM to produce its vehicles, thereby reducing its CAPEX requirements.  As far as financial projections are concerned, the company expects to earn a revenue of $120 million in 2021.  This top-line metric, however, is expected to swell to $1.43 billion by 2024 and to a whopping $4.12 billion by 2026.

78.     On December 7, 2020, HCAC IV announced that it would hold a Special Meeting of its stockholders to vote on the proposed Merger.

79.     On December 21, 2020, HCAC IV and Canoo Holdings announced that at the Special Meeting, HCAC IV's stockholders voted to approve the stockholder proposals necessary to complete the Merger, which closed on December 21, 2020.  They also announced that HCAC IV would change its name to "Canoo Inc."

80.     On the same day, commenting on the Merger, defendant Aquila stated:

"This next chapter is a very important one for Canoo as we prepare to complete advanced testing of our innovative electric mobility platform and to bring our recently unveiled multi-purpose delivery vehicle to limited production in 2022, and to commercial production and rollout in 2023.  On behalf of all of us at Canoo, we are committed and excited about our go-to-market opportunities and to bring both consumers and businesses the benefits of our platform.  We are extremely passionate about fulfilling our mission to bring EVs to everyone."

81.     Defendant Hennessy similarly stated:

"We are excited to see this merger successfully realized and congratulate Canoo on this milestone.  Our commitment to sustainable technologies and infrastructure is resolute, and Canoo is a fitting long-term partner as we usher in a new era for

urban mobility with innovative and affordable EVs.  We look forward to collaborating with Canoo as they bring game-changing EV solutions to B2C and B2B markets and execute against their vision."

82.    Additionally, according to HCAC IV's November 27, 2020 Amended Form S-4, HCAC IV's Board of Directors did not obtain a third-party valuation or fairness opinion in connection with its recommendation that stockholders approve the Merger.

**The Undisclosed Truth About Canoo Holdings' Business**

83.    In truth, Canoo Holdings' business and operations were not nearly as successful as the Individual Defendants claimed.  Accordingly, between August 2020 and March 2021, numerous statements by and on behalf of Canoo (and its predecessor, HCAC IV) were materially false and misleading when made because of defendants' failure to disclose the following true facts about the Company's business, operations and prospects:

(a)    Canoo Holdings had already, or was in the process of, abandoning its engineering and technology services business;

(b)    Canoo Holdings was no longer generating engineering and technology services revenues;

(c)    Canoo Holdings had already, or was in the process of, curtailing its arrangement with Hyundai; and

(d)    that as a result of the foregoing, the Individual Defendants' statements about Canoo Holdings' financial projections, its relationship with Hyundai, business, operations, and prospects were materially misleading and/or lacked reasonable basis.

**The Individual Defendants Made Improper Public Statements**

84.    Beginning or before August 18, 2020, and continuing until at least March 29, 2021, the Individual Defendants made, allowed the Company (or its predecessor) to

make, and/or failed to correct improper statements in Canoo's SEC filings, press releases, and other public statements concerning the Company's business, operations, and prospects.

85.   On August 18, 2020, Canoo Holdings and HCAC IV jointly announced that they had entered into a definitive merger agreement.   HCAC IV filed a Form 8-K with the SEC concerning the Merger announcement, attaching the Agreement and Plan of Merger, a form subscription agreement, the August 18, 2020 joint press release announcing the Merger, and the August 18, 2020 investor slide presentation.   The Form 8-K specifically noted:   "HCAC, the Company and certain of their respective directors, executive officers and other members of management and employees may, under SEC rules, be deemed to be participants in the solicitation of proxies from HCAC's stockholders in connection with the Transactions."

86.   The August 18, 2020 joint press release provided, in relevant part, that the transaction valued Canoo "at an implied $2.4 billion pro forma equity value," and that the "combined company will receive approximately $600 million of proceeds from an upsized fully committed common stock PIPE offering of over $300 million, along with the approximately $300 million cash held in trust assuming no redemptions of HCAC's existing public stockholders."   It also stated that the boards of directors of HCAC IV and Canoo Holdings had both "unanimously approved the proposed business combination, which is expected to be completed in the fourth quarter of 2020."

87.   The August 18, 2020 joint press release included the following quote by defendant Hennessy:

> "We are thrilled to partner with Canoo on their mission to reinvent urban mobility with a greener, simpler and more affordable portfolio of EV solutions.   Unlike any other EV company, Canoo has created a go-to-market strategy that captures both B2C and B2B demand with the same skateboard architecture and technology that has already been validated by key partnerships such as with Hyundai.   HCAC has an abiding commitment to sustainable technologies and infrastructure, and we

are excited to serve as a catalyst to advance the launch of the Canoo vehicle offerings."

88.     The August 18, 2020 joint press release also included the following quote from

defendant Kranz:

> "Today marks an important milestone of Canoo's effort to reinvent the development, production and go-to-market model of the electric vehicle industry. Our technology allows for rapid and cost-effective vehicle development through the world's flattest skateboard architecture, and we believe our subscription model will transform the consumer ownership experience.  We are excited to partner with Hennessy Capital and we are energized to begin our journey through a shared passion to deliver an environmentally friendly and versatile vehicle development platform to the market."

89.     The August 18, 2020 joint press release further provided that:

> Canoo expects to introduce its first model in 2022 that will be targeted at consumers in major urban markets.  This lifestyle vehicle – eponymously named the canoo – leverages the company's low profile skateboard architecture to deliver the highest volume utilization across all classes of competitor vehicles currently on the market and has been purposefully developed for a subscription business model.

90.     HCAC IV and Canoo Holdings also held an analyst and investor conference call

on August 18, 2020 to further promote the proposed business combination.  On the conference

call, defendant Hennessy highlighted Canoo Holdings' "immense" total addressable market

("TAM")and "disruptive" projected revenue and earnings before interest, taxes, depreciation and

amortization ("EBITDA") growth expectations, which he noted were validated by due diligence

conducted by HCAC IV and its affiliates.  He stated:

> What is especially exciting to us, is the immense TAM and projected revenue and EBITDA growth for Canoo shown here, which is supported by our diligence, Myriat industry experts and reports on electrification, consumer acceptance and demand drivers.  This disruptive growth profile is further validated by the fact that Canoo, unlike almost any other EV company, has created a go to market strategy that captures both B2C and B2B demand with the same skateboard architecture.

91.     Defendant Kranz also explained on the conference call that a "unique" aspect of Canoo Holdings was its three revenue streams: (i) engineering services; (ii) business to consumer, or "B2C"; and (iii) business to business, or "B2B."  Defendant Kranz noted that engineering services was the only line business currently generating revenue, with the launch dates of Canoo Holdings' B2C and B2C business lines expected in 2022 and 2023, respectively.  Specifically, he stated:

> Moving now to slide 17.  This is also something I would consider unique for a start up.  We have three phases of revenue streams.  And the first phase, we call it engineering services.  This is a phase that already [exists] today.  So we are working for companies and we are already making money with the first revenue stream.  The second revenue stream is a B2C.  So this is our stream that we will have available when we launch our first vehicle, our Lifestyle vehicles, by 2022.  This is a consumer vehicle and it will be on subscription.  The B2B service that you see on the right side, is our third revenue stream.  This will be a vehicle introduced in 2023 what we call a last-mile delivery vehicle and this will be for sales.  So three different revenue streams give us a very good flexibility and it makes also sure that we can really tap into different areas to be profitable.

92.     During the conference call, HCAC IV and Canoo Holdings presented slides which were later made available to all investors in HCAC IV's Form 8-K filing with the SEC.  The August 18, 2020 slides projected that the Company's revenue and EBITDA would achieve a CAGR of 70% and 127%, respectively:



93.     The August 18, 2020 slides also claimed that Canoo Holdings' immediate contract

revenue "de-risks [its] go to market strategy":

C A N O O

## WHAT CANOO HAS ACHIEVED IN TWO YEARS

RAPID DEVELOPMENT — Only 19 months to design, engineer and manufacture Beta vehicle – **a process that typically takes 3 to 5 years**

EFFICIENT CAPITAL DEPLOYMENT — **$250 million investment to reach Beta** vs. market standard typically measured in billions of dollars

PROPRIETARY TECHNOLOGY PLATFORM — **Develops and owns proprietary technology**, and therefore **not dependent on external licensing**

IMMEDIATE REVENUES — Phased, de-risked go to market strategy resulting in immediate revenues

ASSET-LIGHT MANUFACTURING — Asset-light business model with **a leading contract manufacturing partner**

MARKET VALIDATION — **Strong relationships with global leaders,** including Hyundai, validate commercial progress, versatile applications for both consumer and B2B; positive consumer engagement

PURPOSE-BUILT FINANCIAL PROFILE — **Subscription business model with potential to deliver highly attractive returns on equity** enabled and enhanced by Canoo's technology platform and purpose-built Lifestyle Vehicle

EXCEPTIONAL TEAM — **Highly experienced team** with deep automotive and technology background

10

94.     The August 18, 2020 slides further boasted that Canoo Holdings' engineering services line of business would generate $120 million in engineering services revenue during 2021 and a five-year revenue CAGR for engineering services of 39%:



95.     On this topic, during the August 18, 2020 conference call, defendant Balciunas added that Canoo Holdings' engineering services line of business is a "very important part of our overall strategy," a "great way for us to pool revenues early," and "de-risk the company's strategy as a whole."  He further stated:

> You heard Ulli describe it earlier that we've had three phases of revenue and this is the first phase of revenue that we have.  This is a very important part of our overall strategy, as it's the great way for us to pool revenues early and de-risk the company's strategy as a whole.
>
> On 37, are a few examples that I'd like to discuss.  We've been targeting specifically technology companies, passenger OEMs, delivery OEMs and then autonomous driving companies as potential partners.  Currently in our pipeline, we have $120 million of projected revenue in 2021, which consists of a couple of projects that are in the advanced stages of negotiation.
>
> Overall, we have 7 projects in our pipeline and they range from designing new top hats to doing engineering work on our existing skateboard platform, to

potentially doing skateboard licensing in the future, which is a significant revenue upside opportunity for us. But also this could potentially reduce our overall costs through economies of scale. We also will be interested in selling commercial vehicles, which is our last mile delivery vehicle to potential partners.

96.     During the August 18, 2020 conference call, HCAC IV and Canoo Holdings also addressed the latter's purportedly positive relationship with Hyundai. In a February 2020 press release announcing the accord between Hyundai and Canoo Holdings, Hyundai had referred to the arrangement as a "collaboration" to jointly develop an EV platform for future Hyundai models. However, during the August 18, 2020 conference call, defendant Balciunas suggested that the relationship was now something more, calling it a "multiple phase partnership," with Canoo Holdings rendering engineering service to Hyundai. He stated:

Most importantly, is with Hyundai. This is something that we are incredibly proud of to have this partnership with the world-class OEM like Hyundai. This is a multiple phase partnership and we've currently are in the first phase in doing some contract engineering work that leverages our existing technology, but we're tailoring it to Hyundai's specifications.

With this potential opportunity to move forward into future phases, we would then be drilling into specific componentry and also doing simulations and tests on software and then ultimately the final phase could potentially be delivering hard assets that could be tested and validated in the real world. So, this is a really great opportunity and benchmark for the marketplace to have this kind of validation, especially considering that we are a much smaller company versus Hyundai.

*     *     *

If I were to leave you with two primary points from this page. The first is, these projects are incredibly difficult to secure. We have been working with these partners for over 6 months up to a year to be able to have some of these relationships. So it's not easy for other competitors to come in and do the same thing. The second point is, our competitors are purchasing their technology from OEMs. However, we have the OEMs coming to us to purchase the technology. Because they've recognize that we've done something very unique and we could help speed up their electrification strategy and bring new products to market faster.

97.     The August 18, 2020 slides included a Financials & Transaction Overview which contained various financial projects described as sustainable and very conservative.



98.     As to Canoo Holdings' engineering services revenue, the August 18, 2020 slides projected "$120 million of projected [engineering service] revenue in 2021":



99.     Moreover, on the topic of financial projections, during the August 18, 2020 conference call, defendant Balciunas stated:

> If we turn to slide [5]1, we have an overview of our financial projections.  And before we drill into these figures, I do want to highlight a couple of points.  The first is, we wanted to build a financial model that was sustainable and profitable on itself based on the unit economics that you heard Alex described earlier.  What we did not want to do is, build the model that only worked, if you had to layer on a lot of government subsidies and that's because we don't know how long those subsidies will be in place and available to EV companies.

> The second point is, we wanted to have a very conservative ramp-up. Producing a vehicle is very difficult and complicated and those first couple of years you want to make sure you have a realistic ramp-up in terms of being able to hit those numbers and produce a quality product.  If we look at our volumes, the lifestyle consumer vehicle, we launch that in 2022 with 10,000 units and then ramp up to 25,000 units and then double to 50,000 units, where we cap out.  Of course, if there's greater demand for this product, we can install additional capacity at our manufacturing facility.

100.    On September 18, 2020, the Company filed its Registration Statement on SEC Form S-4, in which HCAC IV's board of directors requested that stockholders vote in favor of the Merger.  The filing, subsequently amended, including on December 4, 2020, highlighted that Canoo Holdings' engineering services business "offers a unique opportunity to generate immediate revenues in advance of the offering of our first vehicles and our current pipeline in this area is supportive of a projected $120 million of revenue in 2021" and that "[w]e expect our engineering and technology services business to offer significant growth potential in the future." Specifically, the Proxy/Registration Statement stated:

### *ENGINEERING AND TECHNOLOGY SERVICES*

> Canoo's engineering and technology services business covers all the material consulting and contract engineering work that is in high demand due to our team's specialized experience and technical capabilities in EV development. This business offers a unique opportunity to generate immediate revenues in advance of the offering of our first vehicles and our current pipeline in this area is supportive of a projected $120 million of revenue in 2021.  We expect our engineering and technology services business to offer significant growth potential in the future as projected demand grows for EVs and their related technologies,

namely in platform/skateboard development, powertrain, battery technologies and power electronics, among other areas, in which we have substantial expertise. In addition to providing external commercial validation of Canoo's technical capabilities, these contract engagements establish an attractive strategic pipeline for future business opportunities and de-risk our overall business model.

101.    The S-4 Registration Statement also stated that the engineering services business would provide the Company with additional sources of revenue and long-term commercial opportunities and that the Company expected to announce many more partnerships associated with that line of business:

Contract engineering opportunities serve as concrete points of external validation for our technology and the talent of our team, as well as provide additional sources of revenue and long-term commercial opportunities (such as skateboard and technology licensing) as the relationship matures. Canoo is also in discussions with a number of other partners and expects to be in a position to announce many more partnerships in due course.

102.    Further, the S-4 Registration Statement noted the significant market potential for engineering services revenue, stating, in pertinent part:

**Contract Engineering services offer a separate revenue stream and validate the quality of our technology**

There exists significant market potential for contract engineering services among legacy OEMs who lack the expertise to develop an electric powertrain at the pace needed to capitalize on the rising regulatory requirements and global demand for EVs. Canoo is at a distinct competitive advantage to capitalize on this growing demand by leveraging the extensive knowledge and experience of its world class team. In fact, whereas other new EV entrants are forced to license key technologies or outsource primary engineering development to larger OEMs, Canoo has already received significant OEM interest in our skateboard technology and our team's expertise in platform engineering, powertrains and vehicle design.

103.    Concerning Canoo Holdings' relationship with Hyundai, the S-4 Registration Statement represented:

In February 2020, Hyundai Motor Group entered into an agreement with Canoo to co-develop a future EV platform based on Canoo's modular and scalable skateboard technology, providing further validation of Canoo's technical leadership and external confidence in its commercial prospects.

\*       \*       \*

In addition to providing external commercial validation of Canoo's technical capabilities, these contract engagements establish an attractive strategic pipeline for future business opportunities and de-risk the overall business model.

\*       \*       \*

In February 2020, Hyundai Motor Group entered into an agreement with Canoo to co-develop a future EV platform based on Canoo's modular and scalable skateboard technology, providing further validation of Canoo's technical leadership.  The agreement provides for the co-development of a platform for a small segment electric vehicle for which the intellectual property developed will be jointly owned by Canoo and Hyundai Motor Group.  The agreement provides that it may be terminated for convenience by either party; however, certain provisions, including with respect to the joint-ownership of intellectual property, survive any such termination.

104.    On September 24, 2020, HCAC IV and Canoo Holdings hosted an analyst day with select Wall Street firms to provide an overview of Canoo Holdings' business and discuss historical and projected financial performance and various other matters, including recent developments with Canoo Holdings and the EV industry generally.  During the presentation, the companies exhibited slides which were later made available to all investors in an HCAC IV SEC filing.  The September 24, 2020 slides were substantially similar to the August 18, 2020 slides and repeated the claims about Canoo Holdings' engineering and technology services business' 2021 projected revenues and favorable relationship with Hyundai.

105.    The August 18, 2020 and September 24, 2020 statements set forth above concerning Canoo Holdings' business and operations, and those concerning the revenues generated by the Company's engineering services business and its relationship with Hyundai, were false and materially misleading for the reasons set forth in ¶¶83, 111-119.

106.    On January 13, 2021, the Company filed with the SEC a Shelf Registration Statement signed by, among others, defendants Aquila, Dattilo, Chiang, Ethridge, Schmueckle, Sheeran, and von Storch.  The Shelf Registration Statement registered for sale: (i) 186.6 million

shares of Canoo common stock by certain selling security holders, including the Individual

Defendants and/or certain of their affiliates; (ii) 22.5 million shares of Canoo common stock

issuable upon the exercise of the public warrants by the holders thereof; and (iii) 1.8 million

shares of Canoo common stock issuable upon the exercise of the private placement warrants by

the holders thereof.

107.   The false and misleading Shelf Registration Statement claimed that Canoo

Holdings' engineering and technology services business was "supportive of a projected $120

million of revenue in 2021."  Specifically, the Shelf Registration Statement stated:

### *ENGINEERING AND TECHNOLOGY SERVICES*

Our engineering and technology services business covers all the material
consulting and contract engineering work that is in high demand due to our team's
specialized experience and technical capabilities in EV development.  This
business offers a unique opportunity to generate immediate revenues in advance
of the offering of our first vehicles and our current pipeline in this area is
supportive of a projected $120 million of revenue in 2021.  We expect our
engineering and technology services business to offer significant growth potential
in the future as projected demand grows for EVs and their related technologies,
namely in platform/skateboard development, powertrain, battery technologies and
power electronics, among other areas, in which we have substantial expertise.  In
addition to providing external commercial validation of our technical capabilities,
these contract engagements establish an attractive strategic pipeline for future
business opportunities and de-risk our overall business model.

Our pipeline for engineering services includes EV concept design and engineering
services for other OEMs, autonomous driving strategics and high growth
technology companies.  There is a significant market for contract engineering
services among legacy OEMs who lack the expertise to develop an electric
powertrain at the pace needed to capitalize on the rising regulatory requirements
and global demand for EVs.  We are at a distinct competitive advantage to
capitalize on this growing demand.  In fact, whereas other new EV entrants are
forced to license key technologies and/or outsource primary engineering
development to larger OEMs, we have already received significant OEM interest
in our skateboard technology and our team's expertise in platform engineering,
powertrains and vehicle design, as is exemplified by the announcement of an
agreement between us and Hyundai Motor Group for the co-development of a
future EV platform based on our modular skateboard technology.

Contract engineering opportunities serve as concrete points of external validation for our technology and the talent of our team, as well as provide additional sources of revenue and long-term commercial opportunities (such as skateboard and technology licensing) as the relationship matures. We are also in discussions with a number of other partners and expect to be in a position to announce many more partnerships in due course.

108. Concerning the Company's relationship with Hyundai, the Shelf Registration

Statement represented, in pertinent part:

In February 2020, we entered into an agreement with Hyundai Motor Group to co-develop a future EV platform based on our modular and scalable skateboard technology, providing further validation of our technical leadership. The agreement provides for the co-development of a platform for a small segment electric vehicle for which the intellectual property developed will be jointly owned by us and Hyundai Motor Group. The agreement provides that it may be terminated for convenience by either party; however, certain provisions, including with respect to the joint-ownership of intellectual property, survive any such termination.

\*       \*       \*

In February 2020, we entered into a strategic partnership agreement with Hyundai Motor Group to co-develop a future EV platform based on our modular and scalable skateboard technology, providing external validation of our technical leadership. The agreement provides for the co-development of a platform for a small segment electric vehicle for which the intellectual property developed will be jointly owned by us and Hyundai Motor Group. The agreement provides that it may be terminated for convenience by either party; however, certain provisions, including with respect to the joint-ownership of intellectual property, survive any such termination. We are also currently in discussions with multiple other blue-chip industry participants interested in leveraging our technologies and engineering expertise for their own commercial products.

109. The statements in the Shelf Registration Statement concerning Canoo's

engineering service revenues and the Company's relationship with Hyundai were false and

materially misleading for the reasons set forth at ¶¶83, 111-119, herein.

110. As early 2021 unfolded, Canoo continued to aggressively promote its business.

On March 10, 2021, the Company announced plans to produce an all-electric pickup truck. The

press release stated that Canoo "debuted today its fully-electric pickup truck during the Motor

Press Guild's Virtual Media Day (VMD) in partnership with Automobility LA." "The pickup truck is the third vehicle that will be based on the company's proprietary multi-purpose platform architecture," the press release stated, "enabling the accelerated development timeline," with preorder for the production version of the pickup opening in Q2 2021, with deliveries beginning as early as 2023." "The production version of the pickup truck will open for preorders in Q2 2021, with deliveries beginning as early as 2023," the press release concluded.

**The Truth Emerges**

111.     Defendants' unlawful scheme continued until late March 2021.  Then, on March 29, 2021, Canoo issued a press release announcing its 2020 fourth quarter and full year financial results.  Evidencing the Company's abandonment of its engineering services line of business and the curtailment of its arrangement with Hyundai by no later than the beginning of the fourth quarter of 2020, Canoo reported no engineering services revenue during the fourth quarter of 2020, after having reporting $2.55 million in engineering services revenue during the first nine months of 2020.  The Company also announced that defendant Balciunas, who served as Canoo's CFO following the close of the Merger, resigned effective April 2, 2021.

112.     On the same date, Canoo held an earnings conference call with analysts and investors to discuss the Company's operations and earnings release.  During the call, defendant Aquila for the first time revealed that the Company decided to "de-emphasize the originally stated contract engineering services line" and that its highly touted arrangement with Hyundai had been placed "on hold."

113.     While stockholders had previously been told that the engineering services business was "very important part of our overall strategy" and that it provided "a unique opportunity to generate immediate revenues," defendant Aquila now claimed that contract

manufacturing, *i.e.*, engineering services, is "not the best business line to be in" and stated the

Company's relationship with Hyundai had been suspended, stating, in pertinent part:

> Joseph Spak, Analyst [– RBC Capital Markets:]
>
> . . . Last one for me, just going back to the decision to the emphasize engineering. With the Hyundai arrangement, the original one, which I am assuming that's now off the table, but if you go back to their release[] did say Hyundai gains access to technology. You mentioned IP leakages [as] one of the potential problems with that arrangement. Can you just talk about like how do you unwind that sort of I guess memorandum of understanding what work was done? Do you think there was any IP-related, [ph] obviously, Hyundai coming out with their own electric vehicle platforms as well?
>
> [Defendant Aquila:]
>
> I think what happened is pretty kind of case in point, right. So I think the Company just like any adolescent company is it's learning, its way and all of us go through it. But it factored in contract manufacturing based on the labor of engineers, not based on the value of IP, which would change the value of that contract significantly. And look we have experience in this area and we're very focused on, if we do work, one we can protect our IP and we can get the residual value of that in addition to.
>
> So it's kind of caused us to say, hey, let's put that on hold, we have so much demand for our three derivatives, let's get all that work done, and then let's look at if there partnerships. Partnerships can work in this industry but contract manufacturing work is, as you know, is not the best business line to be in. And so was there some leakage? Well, I'll leave it to you to make that decision. But obviously, I'm not a big fan of doing that type of business.

114.    Securities analysts were quick to point out that the Company's new strategy

contradicted defendants' statements prior to, and after, the Merger. Analyst Craig Irwin from

Roth Capital Partners stated: "So I would acknowledge that these are significant surprises on the

call today, and that's not ideal after a SPAC – the IPO process. So I just wanted to underline

that."

115.    The following exchange between Craig Irwin and defendant Aquila transpired:

> Craig Irwin, Analyst [– Roth Capital Partners:]

. . . So Tony, you talked about how engineering IP broadens your TAM [*i.e.*, total addressable market], but then you announced that you're de-emphasizing your engineering services.  Can you help us resolve that and maybe give us a little bit more color about why you would deemphasize engineering given that the original story was it would subsidize the development and broaden the partner opportunity with potentially multiple hats under license?

[Defendant Aquila:]

. . . I would say that from a Company perspective, it was a contradiction.  It hasn't been a contradiction from my statement.  Look, as I overly – as I said in the remarks, we look into this and it kind of goes us to your first question too with the talent war and everything.  Just $25 million, it would yield us, we at the Board really feel like the best thing to do is to accelerate our derivatives and focus our talent on creating IP for the Company.

116.    Craig Irwin also questioned management about the Company's 2021 engineering services revenue guidance of $120 million given abandonment of the engineering services business, asking whether the "original SPAC model is no longer guidance going forward." Defendant Aquila appeared to confirm the analyst's suspicion, stating, in pertinent part:

[A]t this point, it doesn't make sense to give guidance until we complete the work that we have started.  And with all that's going on in the SPAC world, in the pre-revenue side, we want to be very conservative. . . .  Certainly, I do acknowledge your point Craig that you got so to speak as you mentioned, showed a different model.  But this model is better from a return on capital basis.

117.    In an exchange with another securities analyst, defendant Aquila acknowledged that defendants had been "presumptuous" and that their prior statements were "aggressive" and "premature," stating, in pertinent part:

Steve Sakanos, Analyst [– Cronos Capital:]

Hi.  And last year – during the course of the year, you stated a couple of times that you had under discussion with some OEMs and possibly the contract manufacturer.  You said that there are going to be some announcements by the end of Q4.  I'm just wondering what happened that changed all of that?

[Defendant Aquila:]

Right. So you're again owning the past as much as the present in the future.  Look, I can only speak to what I know about this.  I think that they were focused on

maybe a little more aggressive than I would be in their statements. I think more maturity of this team would not be that presumptuous. We only announced what is contracted. But yeah, I think they had the opportunities but they weren't at our standard of representation to the public markets.

*   *   *

And then with respect to contract manufacturing, again we wouldn't make an announcement. Again, this comes back to having an experienced public company team here to be careful of the statements you make. So again, I think it was a little premature.

118.     Sensing the discontent of the analyst community, defendant Aquila offered an apology, "[a]nd again I apologize to anybody. As a leader, you always own the past before the present or the future. And so I take everyone's comments in all three categories."

119.     On this news, the trading price of Canoo common stock crashed more than 21% in a single day, down from $11.80 per share on March 29, 2021 to $9.30 per share on March 30, 2021, eventually falling to $8.47 per share on April 5, 2021, wiping out more than $1.6 billion in once valuable shareholders' equity.

## DAMAGES TO CANOO

120.     As a result of the Individual Defendants' improprieties, Canoo disseminated improper public statements concerning its business, operations and prospects. These improper statements have devastated Canoo's credibility and caused the Company to lose more than $1.6 billion in market capitalization.

121.     These actions have irreparably damaged Canoo's corporate image and goodwill. For at least the foreseeable future, the Company will suffer from what is known as the "liar's discount," a term applied to the stock of companies who have been implicated in misleading the investing public, such that Canoo's ability to raise equity capital or debt on favorable terms in the future is now and will continue to be impaired. The Company stands to incur higher marginal costs of capital and debt because of the misconduct.

122.     The Individual Defendants' improper course of conduct has also subjected the Company to potentially enormous damages in connection with the Securities Class Actions.  The Securities Class Actions allege that the Company and other top insiders violated federal securities laws by repeatedly misrepresenting the Company's business, operations and prospects.

123.     As a direct and proximate result of the Individual Defendants' conduct, the Company has needlessly expended, and will continue to expend, significant sums of money. These expenditures include, without limitation:  (i) costs and damages associated with the overpayment for the acquisition of Canoo Holdings in the Merger; (ii) costs incurred in connection with issuing false and misleading proxy solicitations seeking approval of the Merger; (iii) costs incurred in investigating and defending Canoo and its top insiders in the Securities Class Actions; (iv) lost sales and orders resulting from exposure of the Company's misleading disclosures regarding its business, operations and prospects; and (v) costs incurred from compensation and benefits paid to the Individual Defendants, who have breached their fiduciary duties to Canoo.

## DEFENDANTS' DUTIES

**The Individual Defendants' Fiduciary Duties**

124.     By reason of their positions as officers and/or directors of Canoo and because of their responsibility to control the business and corporate affairs of the Company, the Individual Defendants owed, and owe, the Company and its stockholders the fiduciary obligations of good faith, loyalty, due care, and candor and were, and are, required to use their utmost ability to control and manage the Company in a just, honest, fair and equitable manner.  Each Individual Defendant owed, and owes, the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company, as well as the highest obligations of fair dealing and not to act in furtherance of their personal interest or benefit.

- 43 -

125.   Because of their positions of control and authority as officers and/or directors of Canoo, the Individual Defendants were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial and directorial positions with Canoo, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's business, operations, and prospects so that the market price of the Company's stock would be based on truthful and accurate information.

126.   At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Canoo and was at all times acting within the course and scope of such agency.

127.   To discharge their duties, the Individual Defendants were, and are, required to exercise reasonable and prudent oversight and supervision over the management, policies, practices and controls of Canoo.  By virtue of such duties, the Individual Defendants were, and are, required to, among other things:

(a)   exercise good faith to ensure that the Company is operated in a diligent, efficient, honest, and prudent manner and in accordance with all applicable laws (including federal and state laws, government rules and regulations, and the Company's certificate of incorporation and bylaws);

(b)   neither violate nor knowingly permit any officer, director, or employee of Canoo to violate any applicable laws, rules or regulations;

(c)     remain informed as to the status of Canoo's operations, and upon receipt or notice of information of imprudent or unsound practices, to make a reasonable inquiry in connection thereto and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and affairs of Canoo and procedures for the reporting of the Company's business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate, functioning system of internal controls, such that the affairs and operations of Canoo are conducted in accordance with all applicable laws, rules and regulations; and

(f)     truthfully and accurately inform and guide investors and analysts with respect to the business operations of the Company.

**Duties Pursuant to the Company's Corporate Governance Guidelines**

128.     The Company's Corporate Governance Guidelines ("Governance Guidelines") were adopted by the Board, along with the certificate of incorporation, bylaws, and Board committee charters, to form the framework for governance of the Company.  These guidelines apply to the Individual Defendants in connection with their membership on Canoo's Board.

129.     According to the Governance Guidelines, the role of the Board includes the following:

> Stockholders select directors to provide oversight and strategic guidance to senior management.  A director's responsibility is to fulfill his or her fiduciary duties of care and loyalty, and otherwise to exercise his or her business judgment in the interests of the Company and its stakeholders.  Board service requires significant time and attention.  More specifically, the Board has responsibilities to review, approve, and monitor fundamental financial and business strategies and significant corporate actions, assess the Company's major risks, and consider ways to address those risks, select and oversee management, and establish and oversee processes to maintain the Company's integrity.  To fulfill their duties,

directors must prepare for meetings and discussions with management, participate in Board meetings, review relevant materials, and serve on committees. The Company expects directors to maintain an attitude of constructive involvement and oversight, ask relevant and incisive questions, and demand honest and accurate answers. Directors must act with integrity and demonstrate a commitment to the Company, the Company's values, business, and long-term stockholder value.

130.    According to the Governance Guidelines, "Board Responsibilities" include the

following:

A director should discharge his or her duties, including duties as a member of any committee on which he or she serves, in good faith and in a manner the director reasonably believes to be in the best interest of the Company and its stakeholders. Board members will comply with the laws and requirements of the Exchange and other applicable regulatory agencies and with all policies and guidelines of the Company, including without limitation, the Company's Code of Conduct.

Each director is expected to disclose promptly to the Board and respond promptly and accurately to periodic questionnaires or other inquiries from the Company regarding any existing or proposed relationships with the Company, including compensation and stock ownership, which could affect the independence of the director. Each director will also promptly inform the Board of any material change in such information, to the extent not already known by the Board.

Board members are expected to devote sufficient time and attention to prepare for, attend, and participate in Board meetings and meetings of committees on which they serve, including advance review of meeting materials that may be circulated prior to each meeting.

Directors have an obligation to protect and keep confidential all of the Company's non-public information unless the Company has authorized public disclosure or unless otherwise required by applicable law. Confidential information includes all non-public information entrusted to or obtained by a director by reason of his or her position on the Board. This includes information regarding the Company's strategy, business, finances, and operations, and will include minutes, reports, and materials of the Board and committees, and other documents identified as confidential by the Company. The obligations described above continue even after service on the Board has ended.

Directors may not use such confidential information for personal benefit or to benefit other persons or entities other than the Company. Unless authorized by the Company or applicable law, directors will refrain from disclosing confidential information to anyone outside the Company, especially anyone affiliated with any entity or person that employs the director or has sponsored the director's election to the Board. These obligations continue even after service on the Board has

ended.  Any questions or concerns about potential disclosures should be directed to the Company's In Charge of Legal, who then may communicate with the Chief Executive Officer or the Nominating and Corporate Governance Committee regarding the potential disclosures.

**Duties Pursuant to the Company's Code of Business Conduct and Ethics**

131.    The Individual Defendants were also bound by the Company's code of business conduct and ethics (the "Code of Conduct"), which applies to all Canoo directors, officers and employees.  Among other things, the Code of Conduct states the Company "is committed to maintaining the highest standards of business conduct and ethics," and "expect[s] every employee, officer and director to . . . apply good judgment and the highest personal ethical standards in making business decisions."

132.    Specifically, the Code of Conduct includes the following:

**1.      HONEST AND ETHICAL CONDUCT**

It is our policy to promote high standards of integrity by conducting our affairs in an honest and ethical manner.  The Company's integrity and reputation depends on the honesty, fairness and integrity brought to the job by each person associated with us.  Unyielding personal integrity and sound judgment is the foundation of corporate integrity.

**2.      LEGAL COMPLIANCE**

Obeying the law is the foundation of this Code.  Our success depends upon each employee operating within legal guidelines and cooperating with local, national and international authorities.  We expect employees to understand the legal and regulatory requirements applicable to their business units and areas of responsibility.  While we do not expect you to memorize every detail of these laws, rules and regulations, we want you to be able to determine when to seek advice from others.  If you do have a question in the area of legal compliance, it is important that you not hesitate to seek answers from your supervisor or the Compliance Officer.

Violation of domestic or foreign laws, rules and regulations may subject an individual, as well as the Company, to civil and/or criminal penalties.

**3.      INSIDER TRADING**

Employees, officers and directors who have access to confidential (or "inside") information are not permitted to use or share that information for stock trading

purposes. All non-public information about the Company or about other companies is considered confidential information. To use material, non-public information in connection with buying or selling securities, including "tipping" others who might make an investment decision on the basis of this information, is illegal. Please refer to the Company's Insider Trading Policy for more detailed information.

## 4.    INTERNATIONAL BUSINESS LAWS

Our employees, officers and directors are expected to comply with the applicable laws in all countries to which they travel, in which they operate and where we otherwise do business, including laws prohibiting bribery, corruption or the conduct of business with specified individuals, companies or countries. The fact that, in some countries, certain laws are not enforced or that violation of those laws is not subject to public criticism will not be accepted as an excuse for noncompliance. Please also refer to the Company's Anti-Corruption Policy.

*      *      *

## 6.    ENVIRONMENTAL COMPLIANCE

Federal law imposes criminal liability on any person or company that contaminates the environment with any hazardous substance that could cause injury to the community or environment. Violation of environmental laws can involve monetary fines and imprisonment. We expect employees to comply with all applicable environmental laws when conducting the business of the Company.

## 7.    CONFLICTS OF INTEREST

We expect our employees, officers and directors to be free from influences that conflict with the best interests of the Company or might deprive the Company of their undivided loyalty in business dealings. Even just the appearance of a conflict of interest can be damaging and should be avoided. Whether or not a conflict of interest exists can be unclear. The following are some (but not all) situations that may involve problematic conflicts of interests: (a) employment by, consulting for, or service on the board of a competitor, customer or supplier; (b) owning a significant financial interest in an entity that does business, seeks to do business or competes with us; (c) soliciting or accepting gifts, favors, loans or preferential treatment from any person or entity that does business or seeks to do business with us; (d) certain types of "moonlighting"; and (e) loans to, or guarantees of obligations of, employees, officers or directors or their family members by the Company. If you have any questions about a potential conflict or if you become aware of an actual or potential conflict, and you are not an officer or director, you should discuss the matter with your supervisor or the Compliance Officer. Supervisors may not authorize conflict of interest matters or make determinations as to whether a problematic conflict of interest exists without first seeking the approval of the Compliance Officer and providing the Compliance Officer with a

written description of the activity.  If the supervisor is involved in the potential or actual conflict, you should discuss the matter directly with the Compliance Officer.  Officers and directors may seek authorizations and determinations from the Nominating and Corporate Governance Committee (the "Committee") of the Company's Board of Directors (the "Board"), or such other committee of the Board that the Board may expressly designate.

## 8.    CORPORATE OPPORTUNITIES

You may not take personal advantage of opportunities for the Company that are presented to you or discovered by you as a result of your position with us or through your use of corporate property or information.  Even opportunities that are acquired privately by you may be questionable if they are related to our existing or proposed lines of business.  Significant participation in an investment or outside business opportunity that is directly related to our lines of business must be pre-approved.  You may not use your position with us or corporate property or information for improper personal gain, nor should you compete with us in any way.

## 9.    FINANCIAL INTEGRITY

The integrity of our records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries to our books of account.  Therefore, our corporate and business records should be completed accurately and honestly.  The making of false or misleading entries is strictly prohibited.  Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees and others.  We also rely upon our accounting and other business and corporate records in preparing publicly filed reports.  Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations.  Employees who contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is complete, accurate and transparent.  Any employee who becomes aware of any departure from these standards has a responsibility to report his or her knowledge promptly to a supervisor, the Compliance Officer, the Audit Committee or one of the other compliance resources described in Section 16.

**Additional Duties of the Individual Defendants Serving on the Audit Committee**

133.    In addition to the fiduciary duties discussed above, the Individual Defendants serving on the Audit Committee owed specific duties to Canoo under the Charter of the Audit Committee of the Board of Directors (the "Audit Charter").  According to the Audit Charter, the purpose of the Audit Committee is to "oversee the Company's accounting and financial reporting

processes, systems of internal control, financial statement audits and the integrity of Canoo's financial statements," "help the Board oversee the Company's legal and regulatory compliance, including risk assessment," and "provide regular reports and information to the Board."

134.   The Audit Charter charges the Individual Defendants serving on the Audit Committee with the following duties and responsibilities, among others:

> **Audited Financial Statement Review; Quarterly and Annual Reports**.  The Committee will review the annual audited financial statements, the quarterly financial statements and the Company's "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Risk Factors," as appropriate, with management and the Auditors.  The Committee will be responsible for recommending to the Board whether the proposed annual audited financial statements should be included in the Company's Annual Report on Form 10-K.

> . . . **Earnings Announcements**.  The Committee will review and discuss with management and the Auditors any proposed earnings press releases and other financial information and guidance regarding the Company's results of operations provided publicly or to ratings agencies (including, without limitation, reviewing any pro forma or non-GAAP information).

> . . . **Proxy Report**.  The Committee will oversee the preparation of any report of the Committee required by applicable law or stock exchange listing requirements to be included in the Company's annual proxy statement.

> *        *        *

> **Internal Control over Financial Reporting; Disclosure Controls**.   The Committee will confer with management and the Auditors concerning the scope, design, adequacy and effectiveness of internal control over financial reporting and the Company's disclosure controls and procedures.  The Committee will review reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and any special audit steps adopted in light of any material control deficiencies.

> *        *        *

> **Ethical Compliance**.  The Committee will review the results of management's efforts to monitor compliance with the Company's programs and policies designed to ensure compliance with applicable laws and stock exchange listing requirements, including the Company's Code of Conduct ("Code").   The Committee will consider any request by directors or executive officers of the

Company for a waiver from the Code.  Any approved waivers shall be promptly disclosed as required by applicable law and stock exchange listing requirements.

. . . **Related Party Transactions**.  The Committee will review and approve, in accordance with the Company's policies, any related party transaction as defined by applicable law or stock exchange listing requirements.

## DERIVATIVE ALLEGATIONS

135.    Plaintiff brings this action derivatively in its own right and for the benefit of the Company to redress injuries suffered, and to be suffered, by Canoo as a direct result of the violations of the federal securities laws, breaches of fiduciary duty, and unjust enrichment by the Individual Defendants.

136.    Canoo is named as a nominal defendant in this case solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

137.    Because current members of the Canoo Board lack independence and/or face a substantial likelihood of liability for the acts and omissions complained of herein, prosecution of this action, independent of the current Board, is in the best interests of the Company and its stockholders.

138.    The wrongful acts complained of herein subjected, and continue to subject, Canoo to harm.

## FUTILITY ALLEGATIONS

139.    Plaintiff incorporates ¶¶1-138.

140.    Canoo's current nine-person Board consists of defendants Aquila, Dattilo, Chiang, Ethridge, Schmueckle, Sheeran, and von Storch and non-defendants Arthur Kingsbury and Claudia Romo Edelman (the "Demand Board").  Plaintiff has not made any demand on the Demand Board to institute this action because such a demand would be a futile and useless act.

**Demand Is Excused as to Defendants Aquila and Ethridge Because They Lack Independence**

141.    Canoo has conceded in its SEC filings that defendants Aquila and Ethridge are not independent directors.  Specifically, in the Company's November 27, 2020 Amended SEC Form S-4 and 2021 Proxy Statement, dated April 29, 2021, Canoo concedes that the Board did not find defendants Aquila and Ethridge to be independent under the NASDAQ's listing rules. Furthermore, defendants Aquila and Ethridge are not independent directors because each of their principal professional occupation is their employment with Canoo.

142.    Defendants Aquila and Ethridge have received and continue to receive substantial monetary compensation and other benefits connected to the Merger and/or executive roles at Canoo.  For example, defendant Aquila, who has served as Executive Chairman of the Company since before the Merger, and currently serves as CEO of Canoo, has received $35,617,564 in compensation and other benefits from Canoo connected to the Merger and his executive position at the Company.  Similarly, defendant Ethridge, who previously served as President, Chief Operating Officer and a Director of HCAC IV (Canoo's predecessor), received $500,000 from the Company the Merger's completion.

143.    Defendants Aquila and Ethridge each hold a significant percentage of Canoo's outstanding common stock (12,394,387 and 354,160, respectively) which was worth $107,955,111 and $3,084,733, respectively, as of April 23, 2021.  This lack of independence renders defendants Aquila and Ethridge incapable of impartially considering a demand to commence and vigorously prosecute this action.

**Demand Is Excused Because All Demand Board Members Face a Substantial Likelihood of Liability for Their Misconduct**

144.    As set forth herein, Demand Board members defendants Aquila, Dattilo, Chiang, Ethridge, Schmueckle, Sheeran, and von Storch breached their fiduciary duties of loyalty and

good faith by making or allowing to be made improper statements in Canoo's (and/or HCAC IV's) SEC filings, press releases and other public statements.  Notably, these defendants signed the Company's false and misleading January 12, 2021 Shelf Registration Statement which registered for sale Canoo shares and which misrepresented and/or omitted material fact around the revenues derived from the Company's engineering and technology services business and the status of Canoo's relationship with Hyundai.

145.    Demand Board members defendants Dattilo, Schmueckle and von Storch, as members of the Audit Committee, had a duty to adequately oversee Canoo's compliance with legal and regulatory requirements, including public disclosure controls and procedures, as well as its risk assessment and management, and internal control functions.  Thus, defendants Dattilo, Schmueckle, and von Storch were responsible for knowingly or recklessly allowing the improper statements contained in the false and misleading January 12, 2021 Shelf Registration Statement and Canoo's other post-Merger communications.  Defendants Dattilo, Schmueckle, and von Storch breached their fiduciary duty of loyalty and good faith by approving or otherwise allowing the improper statements, and therefore failed to properly oversee Canoo's compliance with legal and regulatory requirements, risk assessment, and the Company's internal controls.

146.    Demand Board members defendants Aquila and Ethridge further violated §14(a) of the Exchange Act by negligently making material misstatements and omitting material facts in connection with their proxy solicitations connected to the Merger, as described herein.

147.    Defendants Aquila and Ethridge are also named as defendants in the pending Securities Class Actions which allege that they violated §§10(b) and 20(a) of the Exchange Act by affirmatively making false and misleading statements and/or controlling Canoo and its alleged §10(b) violations.

148.    Accordingly, a majority of the members of the Demand Board, seven of nine directors, face a substantial likelihood of liability for their breaches of fiduciary duty and violations of state and federal law, making any demand upon them futile.

## CONSPIRACY, AIDING AND ABETTING,
## AND CONCERTED ACTION

149.    In committing the wrongful acts alleged herein, the Individual Defendants pursued, or joined in the pursuit of, a common course of conduct and acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct alleged herein as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

150.    During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Canoo (and its predecessor), regarding the Company's business, operations and prospects; and (ii) enhance the Individual Defendants' executive and directorial positions at Canoo and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

151.    The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct.  During this time, the Individual Defendants caused and/or allowed the Company to issue improper public statements.

152.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise and/or common course of conduct was, among other things, to disguise the Individual

Defendants' violations of law, breaches of fiduciary duty and unjust enrichment, and to conceal adverse information concerning the Company's business, operations and prospects.

153.    The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

154.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

**COUNT I**

**Violations of §§14(a) and 20(a) of the Exchange Act**
**(Against the Proxy Defendants)**

155.    Plaintiff incorporates ¶¶1-110 (except as set forth in the following ¶156), as though fully set forth herein.

156.    The "Proxy Defendants" are defendants Hennessy, Petruska, Bell, Shea, Burns, O'Neil, Mas, McClain, Ethridge, Kranz, Aquila, Balciunas, HCP IV Sponsor and HC LLC.

157.    The §§14(a) and 20(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants.  The §§14(a) and 20(a) Exchange Act claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegation of reliance upon

any allegation of, or reference to any allegation of fraud, scienter or recklessness with regard to these non-fraud claims.

158.    Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1), provides:

It shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his [or her] name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. §78l].

159.    Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy solicitation shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

160.    Between at least August 18, 2020 and March 29, 2021, the Proxy Defendants solicited stockholder votes in favor of the Merger through use of materially false and misleading statements and failures to disclose in their proxy solicitations as set forth at ¶¶74-110, above.  In soliciting stockholder votes, the Proxy Defendants misrepresented and failed to disclose the following true facts about the Company's business, operations and prospects:

(a)     Canoo Holdings had already, or was in the process of, abandoning its engineering services business;

(b)     Canoo Holdings was no longer generating engineering services revenues;

(c)     Canoo Holdings had already, or was in the process of, curtailing its arrangement with Hyundai; and

(d)     that as a result of the foregoing, the Proxy Defendants' statements about Canoo Holdings' financial projections, its relationship with Hyundai, business, operations, and prospects were materially misleading and/or lacked reasonable basis.

161.    The Proxy Defendants negligently issued, caused to be issued, and participated in the issuance of materially false and misleading statements to stockholders, which were made for the purpose of soliciting stockholder votes to approve HCAC IV's acquisition of Canoo in the Merger.  In the exercise of reasonable care, the Proxy Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements made would be rendered materially false and misleading.

162.    The proxy solicitation process was an essential link in the approval of the Merger. The misrepresentations and omissions were material to HCAC IV stockholders in voting on the matters set forth for stockholder determination, including the approval of the Merger.

163.    As a direct and proximate result of the Proxy Defendants' wrongful conduct, HCAC IV, Canoo Holdings, and the Proxy Defendants misled and/or deceived Canoo stockholders by making materially false and misleading statements that were an essential link in stockholders heeding the HCAC IV board of directors' recommendation to approve the acquisition of the Company.

164.    Canoo was damaged as a result of the Proxy Defendants' materially false and misleading statements in their proxy solicitations.  Plaintiff, on behalf of the Company, hereby seeks relief for damages inflicted upon Canoo based upon the misleading proxy solicitations in connection with the Merger approval of the acquisition of the Company by HCAC IV.

165.    Because of their positions of control and their authority over HCAC IV and Canoo, the Proxy Defendants were able to and did control the actions of the companies, their

employees, and the contents of the proxy solicitations, as set forth herein. The Proxy Defendants therefore qualify as "controlling persons" within the meaning of §20(a) of the Exchange Act. By reason of the above conduct, the Proxy Defendants are also, or alternatively, liable as control persons of Canoo (or its predecessor) pursuant to §20(a) of the Exchange Act.

## COUNT II

### For Contribution for Violations of §§10(b) and 21D of the Exchange Act
### (Against the Securities Class Action Defendants)

166.    Plaintiff incorporates ¶¶1-154.

167.    The "Securities Class Action Defendants" are defendants Hennessy, Petruska, Bell, Shea, Burns, O'Neil, Mas, McClain, Ethridge, Kranz, Aquila, Balciunas, HCP IV Sponsor and HC LLC, who are named as defendants in the Securities Class Actions.

168.    Canoo is named as a defendant in the Securities Class Actions, which assert claims under the federal securities laws for violations of §10(b) of the Exchange Act. If the Company is found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of some or all of these defendants as alleged herein. The Company is entitled to receive contribution from the Securities Class Action Defendants in connection with the Securities Class Actions against the Company.

169.    The Securities Class Action Defendants, as directors and officers and otherwise, had the power and/or ability to, and did, directly or indirectly, control or influence the Company's general affairs, including the content of public statements about Canoo, and had the power and/or ability, directly or indirectly, to control or influence the specific corporate statements and conduct that violated §10(b) of the Exchange Act and Rule 10b-5.

170.    The Securities Class Action Defendants are liable under §21D of the Exchange Act, 15 U.S.C. §78u-4(f), which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

171.    As a result, the Securities Class Action Defendants damaged Canoo and are liable to the Company for contribution.

**COUNT III**

**Breach of Fiduciary Duties**
**(Against the Individual Defendants)**

172.    Plaintiff incorporates ¶¶1-154.

173.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers of Canoo, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware, or reckless in not being aware, posed a risk of serious injury to Canoo.

174.    The Individual Defendants owed fiduciary duties to Canoo and its stockholders. By reason of their positions as fiduciaries to and/or controlling persons of the Company, the Individual Defendants owed duties of good faith, loyalty, candor and truthful disclosure.  In addition, the Individual Defendants had specific fiduciary duties as defined by the Company's corporate governance documents, and principles that, had they been discharged in accordance with the Individual Defendants' obligations, would have prevented the misconduct and the consequent harm to Canoo.

175.    The Individual Defendants consciously breached their fiduciary duties and violated their corporate responsibilities in at least the following ways:

(a)    Affirmatively making, allowing, controlling, and/or failing to correct improper and misleading statements in Canoo's press releases, SEC filings, conference calls, and

other public statements, relating to, among other things, the Company's business, operations and prospects;

(b)     Failing to ensure the Company's compliance with relevant legal and regulatory requirements, as well as its own internal policies and procedures, including, but not limited to, requirements imposed under federal and state securities laws;

(c)     Failing to implement, maintain and monitor adequate internal controls; and

(d)     Paying or causing Canoo to pay themselves compensation while in breach of their fiduciary duties, which also included share-based compensation awarded at share prices that were artificially inflated by their misconduct.

176.    As the Individual Defendants breached their fiduciary obligations, the Company has sustained significant damages.  Accordingly, the Individual Defendants are liable to Canoo.

177.    In addition, each of the Individual Defendants had actual knowledge of the Individual Defendants' breaches of fiduciary duties, knowingly participated in the breaches, and the Company has sustained significant damage as a result.  Accordingly, the Individual Defendants are further liable to Canoo for aiding and abetting their fellow defendants' breaches.

178.    Plaintiff, on behalf of Canoo, has no adequate remedy at law.

### COUNT IV

### Unjust Enrichment
### (Against the Individual Defendants)

179.    Plaintiff incorporates ¶¶1-154.

180.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Canoo.  The Individual Defendants were

unjustly enriched as a result of the compensation and officer and director remuneration they received while breaching their fiduciary duties.

181.    The Individual Defendants sold Canoo stock while in possession of material, adverse nonpublic information that artificially inflated the price of Canoo stock.  As a result, the Individual Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

182.    Plaintiff, as a stockholder and representative of Canoo, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

183.    Plaintiff, on behalf of Canoo, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff demands judgment as follows:

A.    Finding that a stockholder demand on the Demand Board would have been a futile and useless act;

B.    Finding that the Individual Defendants violated the federal securities laws, breached their fiduciary duties to the Company, and were unjustly enriched;

C.    Directing Canoo to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to Canoo's bylaws or articles of incorporation, and taking such other action as may be necessary to place before stockholders for a vote the following corporate governance proposals or policies:

- • a proposal to appropriately test, and then strengthen, the Company's internal-operational control functions;

- • a proposal to appropriately test, and then strengthen, Canoo's disclosure controls to ensure that all material information is adequately and timely disclosed to the SEC and the public;

- • a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- • a proposal to develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

- • a proposal to require an independent Chairman of the Board; a proposal to declassify the Board; and a proposal to permit the stockholders of the Company to nominate three candidates for election to the Board;

D.      Against each of the Individual Defendants in favor of Canoo for the amount of damages sustained by the Company (and its predecessor company), jointly and severally, in an amount to be determined at trial, together with pre- and post-judgment interest at the maximum legal rate allowable by law;

E.      Requiring the Individual Defendants to return to Canoo all compensation and remuneration of whatever kind paid to them by the Company (or its predecessor company) during the time that they were in breach of the fiduciary duties;

F.      Directing the Individual Defendants to establish, maintain, and fully fund effective corporate governance and compliance programs to ensure that Canoo's directors, officers, and employees do not engage in wrongful or illegal practices;

G.      Granting appropriate equitable and/or injunctive relief to remedy the Individual Defendants' misconduct, as permitted by law;

H.      Awarding to plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

I.      Granting such other and further relief as this Court deems just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury.

ANDREWS & SPRINGER LLC

*Of Counsel:*

Travis E. Downs III
Benny C. Goodman III
Erik W. Luedeke
ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058
Email: TravisD@rgrdlaw.com
       BennyG@rgrdlaw.com
       ELuedeke@rgrdlaw.com

Brian J. Robbins
ROBBINS LLP
5040 Shoreham Place
San Diego, CA 92122
(619) 525-3990
Email: BRobbins@robbinsllp.com

Dated: June 25, 2021

*/s/ Peter B. Andrews*
Peter B. Andrews (#4623)
Craig J. Springer (#5529)
David M. Sborz (#6203)
3801 Kennett Pike
Building C, Suite 305
Wilmington, DE 19807
(302) 504-4957
Email: pandrews@andrewsspringer.com
      cspringer@andrewsspringer.com
      dsborz@andrewsspringer.com

*Attorneys for Plaintiff*